# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

* * *

THE UNITED STATES OF AMERICA,

          Plaintiff,

v.

CHRISTOPHER BRANDON WILLIAMS,

          Defendant.

2:05-cr-00441-KJD-LRL

**MOTION TO SUPPRESS (# 21)**

## REPORT & RECOMMENDATION

The defendant, Christopher Williams, is awaiting trial on a charge of felon in possession of a firearm . He has filed a Motion to Suppress (# 21), which addresses the circumstances surrounding his arrest on September 29, 2005. Defendant asks the court to suppress the firearm and ammunition seized as a result of the officers' search of defendant's person on the ground that the officers conducted the search absent reasonable suspicion. Defendant further asks that the court suppress all statements he made following the seizure because he did not voluntarily waive his *Miranda* rights. The government counters that there was no unlawful seizure or investigative detention of defendant. Additionally, after his arrest defendant was read his *Miranda* rights before each interview, and each time acknowledged his understanding of those rights. Therefore, according to the government, there was no illegal police conduct in this case that supports the suppression of any evidence.

## THE EVIDENCE

An evidentiary hearing was conducted on June 7, 2006 and June 14, 2006. The government's witnesses were Las Vegas Metropolitan Police Department Officers Christopher Pollock, Mary Lou Crocker, and Criminalist Minoru Aoki. The defendant offered no testimony or other evidence.

On September 29, 2005, at approximately 7:36 p.m., Officer Pollack responded to a call of shots fired in the area of 1213 W. Adams Avenue. A caller reported a black, male adult walking east bound on Adams Avenue, shooting at cars. The caller indicated the man was wearing a white tee shirt and jeans. Subsequent callers reported a man, fitting the description, located in the general area. A final caller gave the same description as the others except that the man was wearing a grey shirt and that the gun was making clicking sounds as the man attempted to shoot it.

Officer Pollack saw a black male adult standing in the middle of the intersection of Adams and I Streets. The man was wearing a grey shirt and jeans. Officer Pollack was in uniform, and driving a marked patrol car with its red lights and siren on. At the hearing Officer Pollack identified the defendant Williams as the man he saw standing in the intersection.

When Officer Pollack arrived, another uniformed officer was giving verbal commands to Williams. Pollack ordered Williams to move to the front of the patrol car and show his hands. Williams ignored the commands, and with his hands concealed under his tee shirt, continued to walk around in the intersection. He then walked eastbound on Adams, down the middle of the street about three houses. Officer Pollack, his firearm drawn, followed on foot. He ordered Williams to get on the ground and show his hands. Instead, Williams turned and walked toward Officer Pollack, who retreated behind the driver's side door of his patrol car. When Williams continued to advance toward Pollack, Pollack retreated to the back of his patrol car.

With his hands still concealed under his shirt, Williams continued toward the patrol car, ignoring Pollack's commands. As Williams turned away, Officer Pollack drew his Taser gun and "tased" Williams. Williams fell face first with the probes lodged in his back; he moved as though he was trying to get up, and Officer Pollack "tased" him again. Williams moved his hand toward his pants pocket. The other officer swiped Williams' hand away and retrieved a handgun from Williams' pants pocket. Williams was handcuffed, arrested and transported to University Medical Center ("UMC") for treatment of his injuries.

Officer Crocker, a member of the street crimes team, responded to UMC at approximately 8:45

p.m. She told Williams who she was, read Williams his *Miranda* rights, and said she would like to ask him some questions about what had happened.  Williams said he understood his rights, and proceeded to tell Officer Crocker that he had been kidnapped by Bloods who forced him to smoke a sherm,[1] then gave him a gun and released him.  He also told Officer Crocker that she was pretty, especially her eyes.  While waiting for treatment Williams changed his story and told Officer Crocker that he had broken up with his girlfriend earlier in the day, smoked a sherm, and purchased a gun for $10.00.  At the hearing Crocker testified that Williams was coherent and seemed fine physically except for some scrapes to his face.  She testified that when she saw him at the hospital Williams did not slur his words and seemed awake.  Neither did he exhibit signs of hyperactivity or hallucination, nor did he chatter incessantly.

After Williams was treated and transferred to the jail he was again read his *Miranda* rights by Officer Crocker.   Again he said he understood and repeated, during an interview recorded at approximately 11:00 p.m., that he had smoked a sherm to relax after experiencing girlfriend troubles and that he needed the gun for protection because he had recently been shot in the back.

Criminalist Minoru Aoki testified that Williams was screened for six types of drug profiles, including PCP.  The screening indicated more testing had to be done in regard to marijuana, because there were more than trace levels present.  However, only a trace amount of a substance that could trigger a PCP positive reaction was found, an amount so small that criminalists routinely do not perform further tests in response.  The toxicology report indicated Williams had a "medium" amount of marijuana in his system.

## DISCUSSION

The pivotal issues are whether the officers had a reasonable basis for detaining Williams, and whether the waiver of his *Miranda* rights was voluntarily, knowingly, and intelligently made.

A person is "seized" within the meaning of the Fourth Amendment "only when, by means of

---

[1] Apparently a "sherm" is a cigarette laced with phencyclidine, also known as PCP.

3

physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). The police may seize a person against his wishes, but the police must have a reasonable suspicion supported by articulable fact of criminal activity or involvement in a completed crime. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968). In such circumstances, if the officer also reasonably believes that the person may be armed and presently dangerous, the officer may conduct a protective frisk even absent probable cause. *Id.* at 21–22, 24–25. The scope of the frisk is generally limited to a pat down of the outer clothing for concealed instruments of assault. *Id.* at 30–31. However, an officer may reach directly into an area of the suspect's clothing when the officer has specific information that a weapon is hidden there. *See Adams v. Williams*, 407 U.S. 143, 147–48 (1972).

When deciding whether a detention is based upon reasonable suspicion a court must look at the totality of the circumstances—deferring to a law enforcement officer's ability to draw upon specialized experience and training to draw inferences from and deductions about the cumulative information available to them that might well elude an untrained person. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

When the officers first encountered Williams, he was standing in the middle of an intersection, in the area where shots had just reportedly been fired. He matched the description of the man who reportedly fired the shots. He ignored the officers' commands to come to the front of the patrol car. Instead he walked away down the middle of the street. With his hands concealed under his shirt, he then advanced toward Officer Pollack, who felt the need to retreat first behind his patrol vehicle's open driver's side door, then behind the rear of the vehicle. Williams ignored Pollack's commands that he show his hands, and continued to advance toward Pollack, notwithstanding that Pollack was pointing his own handgun at Williams. When Williams turned away, Pollack tased him, causing him to fall. As Williams appeared to be trying to get up, Pollack tased him again. Williams reached for his pocket, and an officer slapped Williams' hand away and reached into the same pocket. There he found a handgun. Under the totality of these circumstances the court has little difficulty finding that the police had a reasonable suspicion that Williams was armed and dangerous and posed an immediate threat to the

4

safety of the officers and others.  The court further finds that Officer Pollack was fully justified in tasing Williams in order to neutralize the immediate threat.

Williams nevertheless argues that even if the officers had a reasonable basis for tasing Williams, they were without probable cause to arrest him.  Therefore, according to Williams, the gun and ammunition at issue should be suppressed because they were seized after the bounds of a legitimate investigative detention had been exceeded. The court disagrees.  The court finds that there was probable cause to arrest Williams based on Williams' violation of traffic laws, *i.e.*, walking down the middle of the street, and on his aggressive behavior toward the officers coupled with his refusal to respond to their commands.

Law enforcement officers must advise a suspect of his rights to silence and counsel prior to questioning if the suspect is in custody or otherwise deprived of "freedom of action any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Williams's arrest certainly meets the in custody requirement of *Miranda*.  Hence, the officers were required to give Williams his *Miranda* warnings.

A waiver of *Miranda* rights must be shown by a preponderance of the evidence.  *See Colorado v. Connelly*, 479 U.S. 157 (1986).  To prove such a waiver, the government must show that (1) the relinquishment of the rights was voluntary, not the result of intimidation, coercion or deception, and (2) the defendant understood the rights he was waiving.  *Moran v. Burine*, 475 U.S. 412, 421 (1986).  In accessing the validity of a waiver, courts look to the totality of the circumstances surrounding the interrogation.  *Id.*  "[A]n explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the Miranda case." *North Carolina v. Butler*, 441 U.S. 369, 375–76 (1979).

Williams contends that his inhalation of PCP and his injuries as a result of the Taser gun rendered him unable to voluntarily waive his *Miranda* rights.[2]  The evidence belies this contention. The

---

[2]     Williams submitted articles and the safety precautions provided by the Taser gun website to support this assertion.  However, the information was focused on potential death and physical injury; they did not speak to a lasting diminished mental capacity after a person is "tased."  *See* Def.'s Supplemental Br. Exs. A–C.

1  criminalist found only small amounts of a substance that may have been PCP in Williams's system, an

2  insufficient amount to justify a more refined test.  His injuries from the fall after he was tased were

3  minor; he was promptly treated and released from UMC.  Officer Crocker testified that Williams was

4  alert, well oriented, and had no difficulty understanding and waiving his rights.  Moreover, the record

5  contains no evidence that Officer Crocker coerced a waiver by force, threat of force, or intimidation.

6  The court therefore finds by a preponderance of the evidence that Williams' waiver of his *Miranda*

7  rights was voluntary.

8  **RECOMMENDATION**

9  Based on the foregoing, it is the recommendation of the undersigned United States Magistrate

10 Judge that Defendant Williams' Motion to Suppress (# 21) should be denied.

11 DATED this 24th day of July, 2006.

13 _____

14 **LAWRENCE R. LEAVITT**
   **UNITED STATES MAGISTRATE JUDGE**

6